at all. Good morning. Good morning, Your Honor. May it please the court. My name is John Eastman, and I'm counsel for the American Civil Rights Union in this matter. As the clerk has noted, I preserved four minutes for rebuttal. A quarter century ago, a grand bargain was reached in Congress. We were going to loosen up our state voter registration rolls to include registration of motor vehicle departments, so-called motor voter law, welfare offices, et cetera. But in exchange for that, we also got in the National Voter Registration Act mandatory list maintenance to ensure that only eligible voters were on the rolls. Those rolls would therefore have to be maintained to make sure that they were accurate and current. The district court's decision below, and I must confess without benefit of the Supreme Court's more recent decision in the Husted case, really guts the list maintenance side of that grand bargain. It reads subsection A4 of the National Voter Registration Act, section 8, as the only mandate for list maintenance or for cleaning the voter rolls, only with respect to death and changes of addresses. That decision ignores subsection A1, which specifically refers to only having eligible voters on the rolls. It ignores subsection C2A, which specifically requires states to do a systematic effort to clean the voter rolls of ineligible voters, and more specifically, it ignores the subsequently enacted Help America Vote Act, section 21083A4. The Supreme Court's decision in Husted made very clear that the HAVA, Help America Vote Act, elucidates or elaborates on or clarifies the obligations under the National Voter Registration Act. The lower court's decision also treated- Well, now, the statute itself lays out multiple purposes, not just one purpose in the case, but what I want you to help me with is the text of the statute itself, specifically starting with A4. We're talking about 8A4, which says the following. It says the administration of voter registration for elections for federal office, each state shall, the language is mandatory, not precatory, each state shall conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official list of eligible voters by reason of, and it gives two possible alternative bases. By reason of the death of the registrant or by reason of a change in the residence of the registrant. I think we can all agree that that's mandatory. Yes. The obligation is on the state and on the county to review the official lists and to make sure, as best it can, that they have removed from the registrant lists those who may have died or moved out of the county. That's mandatory. The problem that I see in your argument, and you can help me with it, is that when you look at A3, the language Congress chose to use was very different. Language is awkward, but as best I can tell, it's precatory, not mandatory, because they say each state shall provide that the name of a registrant may not be removed from the official list of the eligible voters except at the request of the registrant. That's one choice. Second, by reason of criminal conviction or mental incapacity, and then third, it references you to A4. But that language seems to me to be pretty clearly precatory rather than mandatory. Congress did not say, although it seems to me it could easily have said if it wanted to in balancing the various policies that it enumerated, it could have said in the administration of voter registration for elections or federal office, each state shall conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of, one, the death of the registrant, two, a change in residence, three, by reason of criminal conviction, or four, based on mental incapacity. But it didn't do that. It chose to treat criminal conviction and mental incapacity in a manner that was different from how it chose to treat the death of the registrant and change in the residence. How do I get around that? Well, the first issue is that in subsection 3b, dealing with criminal conviction and mental incapacity, I think that language is designed to recognize that not all states have the same rules about felons and mental incapacity determinations being ineligible. Right, but Congress, if it wanted to make the obligation to purge on account of criminal convictions or mental incapacity, whatever the state law may have been, if it wanted to make that mandatory, all it had to do was list it with the others that it made mandatory, the death of the registrant, etc. Your Honor, I actually read 3 as a greater mandate than 4, and here, and it's a mandate that makes no sense unless you understand the definition of registrant. It begins with the same, each state shall, the same mandatory language covers both conduct a general program that makes a reasonable effort. Under 3, they shall provide that no one may be removed but for these reasons, and we know that. It doesn't say you must explore for those reasons. It says you can't. It's implicit. It's the problem, you see. They flipped it around and made one portion of it mandatory and another portion, insofar as there is an obligation on the state, purely precatory. It may be wise to purge for mental incapacity, but it doesn't look to me like Congress chose to do that but rather chose to treat it in a separate way. That's the problem that I'm having. Maybe I'm misreading it. No, and I think if that's all we had with subsection 3 and 4, I might agree with you. I think I would put more into the eligible voters. It's implicit that by requiring people to only admit eligible voters to the roles that they're not supposed to admit ineligible voters, but that's implicit. If that's all there was, I think the lower court decision might well be right, but we also have C2, which is, I think, unambiguous. It says, and again in very mandatory language, a state shall complete, and then there's two restrictions. They have to do this. They have to have a program that removes eligible voters. It's not limited to death or relocation, and then the second component of it is, and they have to complete that more than 90, you know, by the 90-day mark before an election, but it also is a mandate. A state shall have this program that removes eligible voters from the roles. Doesn't that language say shall complete any program rather than a program? That's right, if you're going to have such a program, you have to complete it 90 days before the deadline. Why doesn't that language mean that? Well, Judge Grant, it could, I suppose, but I think that is intended instead to give the state discretion on which program to use. The notion that that mandate means they don't have to have any program at all is not the adoption of that language that the Department of Justice has used. In the Missouri case, for example, they specifically said the state's failure to have any program that was completed before 90 days violates the National Voter Registration Act, and that was in the complaint filed in the Missouri case. It's acknowledged both in the district court opinion and in the court of appeals opinion that that was the basis of their claim for a violation of the NVRA, and then all of that is, you know, of the NVRA is intended to remove ineligible voters for whatever reason. You know, if we had somebody who fraudulently registered to vote as Mickey Mouse under the lower court's interpretation of the NVRA, that person could not be removed because the fraudulent registration is not being asked to be removed by the voter, it's not dealing with felon or mental conviction, it's not dealing with change of address or death, and that's just a nonsensical understanding. Help me with C1. That's what you're referencing and you say, you say if all you had was A3 and A4, the district court probably got it right as an interpretive matter, but if you look elsewhere in the statute and you read the thing as a whole, it's clear that they meant to include incapacity and felon convictions with the others. What is there in C1 that suggests that? Not C1, C2, your honor. A state shall complete, not later than 90 days, so we've got two components there, any program, so it can't be no program, it's got to be some program, the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters. That's not limited to change of address or death, it's not limited to felon or mental conviction, it's not limited to request to remove myself, it includes any ground on which a voter is ineligible, a fraudulent registration, a non-citizen, somebody who's registered and actively voting in another state, all of those things are covered by C2A, and HAVA makes that very clear with its mandate. How does HAVA, do you think HAVA changes the language that otherwise appeared in those? As the Supreme Court said repeatedly, and Hugh said, I think it clarifies, it elaborates, it makes explicit what was already implicit in the NVRA. The reason I'm asking the question is as I look at the language of HAVA, it says, and I quote, a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote, blah, blah, blah, under such system consistent with the National Voter Registration Act of 1993, consistent with, they certainly didn't see, the drafters of HAVA didn't see HAVA as creating new obligations, did it? I think what the Supreme Court said and Hugh said was what HAVA did is clarify and elaborate on the things that were already implicit in the NVRA, and I think the language about consistent with the National Voter Registration Act is consistent with the constraints on approval. I guess my question is this, if the only obligation on the state was to purge with regard to the two things that appear in A4, death or change in residence, nothing in HAVA could change that, could it? Well, you didn't read HAVA to rewrite what they wrote in the National Voter Registration Act unless Congress had said we're changing it. I think even if the National Voter Registration Act didn't require broader list maintenance, and I think it does, C2 I think clearly does that, but HAVA specifically says the state shall update their lists regularly, that's furtherance of the of the NVRA Purpose 3 and 4, and they shall have a system that includes the following, and this is mandatory, a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible, doesn't say ineligible by reason of death or relocation, anybody who's ineligible, and that's part of the HAVA mandate, and I think that clarifies the meaning of C2, it indicates the inferred, the negative inference from A1 in the NVRA about only eligible voters being on the rolls, all of which further the purpose to keep the rolls current and accurate, none of which happens if we only limit or truncate the mandate of list maintenance, only death and relocation. Let me ask a slightly different question. We've spent a whole bunch of time on the legal issue, but your argument is twofold. Your argument is A, she got the law wrong, and B, she committed clear error in her findings of fact. Tell me what the clear error is. Well, there are a couple of things on the clear error. I think the most egregious one is we have undisputed evidence in the record that there were no ineligible voters removed from the rolls for a full two-year period. We have unrebutted expert testimony that that itself alone indicates that maintenance activities were not going on, and this is in the summary chart of the data that we have by the expert. It's in tab 217-3 at the end, and this is unrefuted. From 2013 to 2015, not a single inactive voter was removed from the rolls as ineligible, and the unrebutted expert testimony said that just doesn't happen if active list maintenance is going on. Are you talking about Camerata? No, this is Mr. Gessler. Okay, but ask the Camerata. Yeah. The district judge obviously discarded Camerata. That's right. She was free to do that, wasn't she? Not on the basis that she did. Camerata used data sets for population as the denominator and active voters as the numerator. She said the calculations are misleading. Well, there was another expert who testified that what Camerata did that was methodologically unsound was he overstated one and understated the other. He did, and the overstatement and understatement— All I'm saying is that was his account, and the trial judge chose to believe the second expert who basically undermined the credibility or believability of the first expert. I might have read it differently, but the question is whether or not the district judge committed clear error in discrediting one expert and crediting another. I understand the point you're making goes beyond and has less to do with Camerata than with something else, but I'm just asking with respect to Camerata, she was free to discard Camerata, wasn't she? Well, the question is— Without committing clear error. I don't think so, Your Honor, and here's why. The counter-expert was pointedly asked, well, what are your registration rates to show? Because the issue is the registration rate in Broward County, unbelievably, unreasonably, implausibly high compared to the average nationwide and elsewhere in Florida. Nationwide, the average registration rate is about 65%. In Broward County, it was nearly 100%, and the attack on Mr. Camerata's methodology amounts to about a 0.3% difference. So instead of 97.6%, it would have been 97.3%. The reason the other expert never actually gave his data on what his analysis shows is because it would make the exact same point, that the difference was immaterial. Did they offer any data on the point? The data is in the record, Your Honor. No, no, no, no, no. Did the defendant offer any data of its own? No, no, he did not. Mr. Camerata's methodology, he overstates the numerator, although he didn't. Nobody disputes that the numerator was the actual registration right before the election, and he understates the denominator, which was population, because the population data comes from July rather than October. If you look at the population growth rates and add three more months in, it is an immaterial difference to the point, which is the registration rates in Broward County approaching 100%, whether it's 96.6% or 96.3%, they are implausibly high compared to the average in Florida and nationwide. And I think that was the point that Camerata was trying to make. And it was also the point that Mr. Gessler relied on to demonstrate one of the things that ought to trigger a more sustained review of our processes is these unbelievably high registration rates. And that was unrebutted testimony by the expert. And then again, you can look at the data when Mr. Gessler introduces the data on the registration rates, and you can look and extrapolate the numbers, you can see that the rejection of Mr. Camerata was over an immaterial difference. Let me ask you a slightly different question. We've gone over, and I'm going to give you your full rebuttal time. Thank you. It's an important case, and we're looking for all the guidance we can get here. The district court found, with respect to purging for death, that Florida and Snipes did use the SSDI. You assert they didn't. I'm not sure I understand how you can say that in the face of the evidence we have here, including your own expert, Gessler, who noted that he had, quote, that the secretary of state's office does provide the social security death index, which I think is reasonable and proper, and I by no means think that the supervisor was in error in relying upon that. I think it's a good thing that's happening. Well, the next statement is, but they admit that they don't use the social security cumulative death index. And the reason that's significant is that the state health records- I understand about the cumulative, but they used the SSDI, did they not? In the record, they admitted in response to interrogatories that they didn't. They admitted during the course of the trial that they didn't know whether the state did. Is it still your position they didn't use the SSDI? Our position was that there was no evidence that they did in the record. Mr. Gessler then subsequently found out that the state may use it. Well, that's what Gessler said, Mr. East. Yes, yes. Gessler says unambiguously he learned that the Secretary of State provides the SSDI index. That's reasonable and proper. And the supervisor did not make a mistake, was not in error in relying on it. Well, we never connected the dots between whether that's part of the information that the Secretary of State sends down to the supervisor. But that's not my point. The point is on the- No, but that's my question, Mr. East. Mr. Gessler subsequently learned and says on the last day of trial that- Can we fairly read into this record as a fact that they relied on and they used the SSDI? What we learned as a fact is that the Secretary of State did that. We didn't ever learn in the record that that was actually transmitted down to the county supervisors. I suppose we can assume it was. That's what Gessler said, though. He had learned that the Secretary of State office does provide the Social Security death index, provides, not that it has, which I think is reasonable. And by no means, I think that the supervisor would not have been in error in relying upon that. It's a good thing that that's happening. Oh, yeah. Again, we don't know the extent of that connection. My point is- Your expert was wrong in that assertion. No, Your Honor. Your Honor, we didn't- Earlier in the case that they didn't know whether the Secretary of State used that information and therefore they didn't know whether they were getting it, that Mr. Gessler subsequently found that out. We still don't have the actual connection. Is it being put into the record, into the information that the state is passing down to the supervisor? But that's not my main point here. My main point goes back to Gessler's other point, that it's critically important that they use the cumulative Social Security index because the Social Security death index only if you make an error and don't remove that person from the rolls then, or if there is fraud going on with people harvesting names from the cemeteries and then registering to vote, by not using the cumulative death index, you are not picking up those ineligible voters at all. And as Mr. Gessler goes on after making those statements, he then re-talks about the cumulative death index being a critical component of what a reasonable election supervisor would do to maintain current and accurate voter... I've got it. Thanks. Thank you. But I think Judge Grant has some questions for you. I've got a question in a different direction. This is not something that was briefed, but of course we've got an obligation to look at jurisdictional issues. I believe it was discussed at the district court level. Why is a county official the proper defendant in this suit rather than the state or state official? Obviously these burdens in the statute are on the state rather than on the county. And I think the Eighth Circuit decision here in the Missouri case was I think directly on point. The government sued only the state and the issue there was can the state be held liable to enforce NVRA compliance against the local officials? What they held there was that the obligation on the state is not to comply with the NVRA, but also to ensure compliance wherever that occurs. And in Florida, the compliance obligations had been divided between the Secretary of the State and the local county supervisors. So the county supervisors are standing in the shoes of the state when they meet their list maintenance obligations imposed by the NVRA. And I think the district court on that and denying the motion to dismiss on those grounds was absolutely correct. It is a little bit different there than what the Eighth Circuit said, right? The Eighth Circuit was looking at the opposite side of the coin. They were. But the implication there was we can't hold the state liable for the things that the state laws have delegated to the local officials. They are the ones that carry the obligation under the NVRA. We've sued the local official who carries that obligation. And I take it that's true statewide, that on the 67 counties in the state of Florida, each of them assume these obligations. That's correct. Counties are constitutionally created offices, are they not? Yes, and by the state. And so the reference to the word state in the NVRA just says someplace in the state, these obligations have to be fulfilled. And as a matter of state law in Florida, those obligations are filled partly by the Secretary of State's office, but largely by the county supervisor's offices. Could that vary from state to state? Would it depend on how a state had set up its particular election responsibility? It could very well differ state by state. And in the Missouri case, the court there recognizes that some obligations are retained by the Secretary of State. Others are delegated to the local officials. But it's your position that every obligation that you're suing on here is one for which the authority has been delegated to the county officials? That's correct. The list maintenance obligations. Now, some of the data to do that list maintenance obligation comes from the Secretary of State. They're checking of the state vital records and the Social Security death index that Judge to the extent that comes down from the Secretary of State, the original data collection is done there. But it is the obligation of the local elected official, the local election official, to implement that data and clean and make sure that the roles, which are still That obligation is found in state law itself. That's found in state law itself. Florida law, the way the Florida regime is structured, if I have it right, is it puts certain obligations on the state and gives express and explicit instructions that the county has obligations as well. And they are blah, blah, blah, blah, blah. That's right, Your Honor. And to go back to one of your earlier questions on where was there a blatant violation of the NBRA's obligations, this two-year period where not a single ineligible voter was removed from the list. I understand that factual argument. And it also violates state law, Section 98-.065, which specifically requires that by December 31st of every year, they remove all of the inactives that had timed out on the ineligibility period. And you can't get two full years without complying. I'm going to have to bring this to a close. We'll give you your four minutes for rebuttals. Thanks very much. Good morning. Good morning, Your Honors. May it please the Court. My name is Jessica Ring-Amundson, and I represent the intervener 1199 SEIU United. Your Honors, our plan this morning is that I would spend approximately the first 10 minutes of our time addressing the legal requirements of the NBRA and the reasonable efforts standard. Mr. Joseph Gironi, who represents the Broward County Supervisor of Elections, will then address the District Court's findings that the Supervisor, in fact, fully complied with that standard. Your Honors, because this is the only claim in this case is for violation of Section 8 of the NBRA, I would like to begin, as Judge Marcus did, with the plain text of that statute, and specifically Section 8A4, which can be found at pages 2A to 3A of the statutory addendum in our blue brief. Section 8A4 requires that the state, quote, conduct a general program that removes the names of ineligible voters from the list of eligible voters by reason of the death of the registrant or change in residence of the registrant. There is no ambiguity in that requirement. As the District Court correctly found, a state must have a general program, but that general program is limited in two important respects. It is limited to those who have died or changed residence, and it is limited in that a state must only make reasonable efforts to remove those who have died or changed residence. The District Court's conclusion about the requirements of the NBRA is fully consistent with that of the Third Circuit, which found in the ACRU versus Philadelphia case that, quote, by its terms, the mandatory language in Section 8A4 only applies to registrants who have died or moved away. The District Court's conclusion is also fully consistent with the legislative history of the NBRA, which is quoted at page 6 of our blue brief, which states, as Judge Marcus was discussing before, states are permitted to remove the names of eligible voters from the rolls at the request of the voter or as provided by state law by reason of mental incapacity or criminal conviction. In addition, states are required to conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official list by reason of death or change in residence. The ACRU is essentially asking this Court to read Section 8A4 as if it stopped midway through, as if it says that states must simply conduct a general program to But, of course, the statute does not stop there. It goes on to direct states which voters must be found and removed, those who have died and those who have changed residence. To be sure, states can and Florida, in fact, does also have general programs of list maintenance to look for voters who have lost eligibility by way of criminal conviction or have been found mentally incapacitated. But those are not mandated by the NVRA. Those are simply programs that the state has chosen. And the reason that the NVRA does that is because, as Mr. Eastman stated, states have different requirements. Not all states require removal for criminal conviction or mental incapacity. What's your proposed reading of the section that your friends at the other table rely on, C2A, a state shall complete not later than 90 days prior to the date of a primary or general election for federal office, any program, et cetera, et cetera? Judge Grant, I read that section exactly as you suggested, that if a state has any program to remove the voter, that systematic program must be completed within before 90 days before the next election. And, in fact, that's exactly how this Court read that exact provision in the RCIA case where the state had a program to remove noncitizens. And the state read that case or this Court in RCIA read that provision as applying to that program. All that C2A is actually a protective program. It's supposed to protect the voters on the rolls when the risk of erroneous deprivation of the right to vote is the highest, which is the 90 days before the election. And that's exactly what this Court found in RCIA. The other provision in the NVRA that Mr. Eastman pointed to was Section 8A1. And while he reads that as somehow imposing some mandatory list maintenance obligation on the state or supervisors of elections, in fact, again, that is a protective provision designed to further the NVRA's purposes of increasing the numbers of eligible voters on the rolls. It actually requires supervisors of elections to ensure that any eligible applicant is registered to vote in an election, provided that they submit their voter registration application in time, et cetera. Mr. Eastman also pointed to the Help America Vote Act or HAVA. But as Judge Marcus stated, HAVA does not impose any new obligations that are not already found on the NVRA in terms of categories of people that must be found and removed from the rolls. To the extent that HAVA does impose any new obligations, HAVA is not private. There's no private right of action under HAVA. It can be enforced only by the Attorney General or through a state-created administrative scheme. When Congress in HAVA wanted to actually amend the NVRA, it did so explicitly. In Section 903 of HAVA, it explicitly amended the NVRA with respect to clarification of the supervisors or of the state. Nevertheless, Congress felt obliged in HAVA to go beyond the language that appeared originally. It said, among other things, a system of file maintenance that makes a reasonable effort. It mandates that the states implement a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such a system, consistent with the National Voter Registration Act, registrants who have not responded to notice and have not voted in two consecutive elections, the federal office shall be removed. So it goes beyond. Well, Your Honor, it's important to understand the context of HAVA. So HAVA was enacted in response to the election of 2000. And essentially, HAVA was all about getting states to update and modernize their election systems, both their election equipment and their lists. And so HAVA, for the first time, imposed upon states the obligation to keep a computerized list. And really, all that it is doing throughout HAVA is imposing the same obligations that are in the NVRA to the new system of computerized lists. So as Your Honor just read, under such system, consistent with the NVRA, registrants who have not voted in two consecutive elections, general elections, shall be removed, except that no registrant may be removed solely by reason of failure to vote. That, of course, is the provision that the Supreme Court was interpreting in the Husted case. But the point, Your Honor, is that ACRU reads HAVA as imposing mandates upon the state to look for categories of persons beyond those that are required by the NVRA. And again, Section 8A4 cannot be clearer that the only general program that a state is a general program to remove ineligible voters who have died or who have moved away. Your Honors, if I can move to the district court's reasonable effort standard. The district court correctly held that the reasonable effort standard under Section 8A is met if the county uses national change of address information or NCOA information supplied by the U.S. Post Office or similarly reliable information garnered from other sources such as mass mailings or targeted mailings to identify registrants who have changed residence and uses information from the state health department or similarly reliable sources to identify voters who have died. The ACRU's contention is that the reasonable effort standard should be equated with a professional standard of care. And really what the ACRU is arguing is that the district court was obligated to accept the opinion of its expert about what constitutes a general program that makes a reasonable effort to remove ineligible voters. The ACRU actually faults the district court for, quote, substituting its judgment for that of the ACRU's expert. But, of course, the district court did what district courts do in any situation. It evaluated the expert testimony that was before it. It weighed that expert testimony against the documentary evidence and lay witness testimony in the record. And it gave that expert testimony the weight that the district court felt it deserved. The district court was under no obligation to simply accept the ACRU's expert. And beyond having no legal foundation, the professional standard of care standard that the ACRU urges is also unworkable, as it essentially means that you would have an expert in every case opining about the state of the rules in various places, et cetera. Your Honors, I see that my time has almost expired. I would like to turn it over to Mr. Gironi. Before you do, I want to just drill down a little further on the issue of C2A, which is the language Mr. Eastman referenced us to, and which he suggests expands the obligation, not precatory, but mandatory upon the supervisor of elections and the state. C2A says, a state shall complete not later than 90 days prior to the date of the primary or general election for federal office any program, the purpose of which is to systematically remove the names of the ineligible voters from the official lists of eligible voters. Your position is it's simply a timing statement. Yes, Your Honor. That's what it was designed to do. It didn't expand or contract the obligation other than to put a time deadline on for the completion. Yes, Your Honor. Our position is that what's mandated is a program to remove voters who have died or changed residence. What's optional is a program to remove voters by reason of criminal conviction or mental Yeah, I understand that. or other reasons. Is C2 to be read, C2A to be read as relating both to A3 and A4, or just to A4? Well, it is The reason I raise it is, of course, C1 references only A4. C2 speaks more generally. So would it be fair to read C2A as putting that timing requirement on the states, whether it's purging mandatorily or precatorily? The 90 days applies to either or both. The 90 days does apply to whether it's mandatory or precatory. It's simply, and C1, Your Honor, is actually the safe harbor provision. I understand that. I'm not asking you about the safe harbor provision. I'm simply asking, when Congress wrote this requirement that the state shall complete no more than 90 days prior to the primary or the general election, any program, the purpose of which is to systematically remove the names of ineligible voters, it was referring not simply to A4, but also to any program that was conducted pursuant to A3 as well. Is that a fair reading? That's a fair reading, Your Honor. And you can see that also from the exceptions to the 90 day provision, which refer back to the categories of people that are also in A3 as well as A4. So essentially what, and this court interpreted this exact provision in the RCIA case and said that what this means is that if a state has any program, whether that program be the mandatory program for death or change of residence, or whether it be a program that the state has undertaken. In the RCIA case, the state undertook a program, a systematic program to attempt to remove non-citizens from the rolls. And this court read this provision as applying both to the mandatory as well as to the optional programs that the state undertakes. Thanks very much. Thank you, Your Honor. Good morning. Morning. May it please the court. My name is Joseph Droney. I'm here on behalf of the Broward County Supervisor of Elections. The trial court correctly concluded that the Supervisor of Elections complies with the NVRA. In fact, the supervisor's office goes further than the NVRA in its list maintenance practices. As counsel for intervener, Apple Lee, stated, the NVRA requires a list maintenance program to remove the names of individuals who have died or who have changed residences. In my short time, I wanted to address some of the factual questions that the panel asked. Let's start with change of addresses. Other than getting the post office data and using your vendor, and I understand how that process works. Is there any other program to remove those who have changed addresses? Certainly. Other than that process through the post office. Yes, Your Honor. The other programs include mass mailing of non-forwardable mail. The trial court concluded relying upon the testimony of witnesses at trial as well as documents. Tell me that mass mailing of. Non-forwardable mail to eligible, to registered voters in the county. And so then when it's returned because it wasn't forwarded, you can then move from that? Well, it's, that's the procedure there is to identify someone who might have moved. So. Then you send out the notice. Exactly, Your Honor. Subsequently, there's several notices that go out. So you've got the post office, mass mailing of non-forwardable mail with subsequent notice. What else, if anything? Yes, Your Honor. The supervisors also uses through the Department of Highway Safety and Motor Vehicles. Information provided to the Department of State. The Department of State then provides that same information to the supervisor's office. In addition, Florida. What is that? Is that driver license addresses or something? Yes, Your Honor. That's when people request the address on their driver's license change. That information gets sent to the. And then what else? In addition, Florida law places import upon citizen participation and maintenance of the voter rolls. The ACRU's own witnesses testified. They identified people and you responded to that, you claim? Exactly. So those are the main ways. If you do all of that, how do you explain that nobody was removed during the 2013-2015 period, if in fact that's accurate? Well, the trial court was exactly right of this gap. It was just that it was unexplained. OK, so you concede there was evidence nobody was removed between 13 and 15. I would concede, Your Honor, that there is. I know there are 150,000 moved 15 to 17. I'll get to that in a minute, but nobody's removed during 13 through 15. I would, Your Honor, I would. I'm just I'm going to focus on just change of residence and death. I don't want to get into anything else. I think that's probably what's just required. So how is nobody removed from change of residence for two years? I would concede, Your Honor, that there is a document in the record which reflects that no one was removed for these two years. However, a supervisor of elections employees... What does that document say, document reflects? That document is reflected certifications filed with the Florida Secretary of State. OK, so it's not just a document, it's the certification of the list, the voter registration list to the Secretary of State. Correctly. By the Broward County Supervisor. Yes. OK. And the ACRU focuses on this. All right. So I understand that. Let's take then 2017. How many people are removed due to change of address? I guess 17 to 18 or... The numbers that were provided in the record are the numbers from January 2015 to January 2017. And that's nobody? No, this was 1,900 or 192,157 removed. OK, so the no removal was 13 to 15. Exactly. And because Your Honor is asking about change of residences, of that number, 108,000 roughly were inactive voters who were removed. OK, so as of January, what did you say, 15? January 2015 to 2017. January of 2017? Yes. OK, so that two-year period, you had 190,108 were change of address. Then do we have anything from 17 to 18? We don't have anything from 17 to 18. OK, in the record? It's on the record. OK. And there's also... How do you explain the fact that during a two-year period of time, they removed no one? Your Honor, the trial court states that... And one not reasonably infer from the failure to remove anyone that they didn't do anything. That it's inexplicable that no one would have been removed for 24 months. That's the heart of his argument. Yes. That and the figures that Camerata offered. Right. That's the ballgame from his perspective. Exactly. Question is whether or not those two facts are enough to create clear error in the findings by the trial court. The two facts... That's what we're about here. The registration rate and the... Yes, sir. Tell me about each of them. Certainly. And tell me how it is that you can explain no one being removed for 24 months and yet still say that the supervisor of elections complied with the requirements of law. Sir, so... Even assuming that you're right about reading the statute. Yes. With respect to people moving, people dying. So I would concede, Your Honor, that the... There was no one removed on account of death? There's a record reflecting that no one was... No, Your Honor, that... Or is that just with respect to... That was a change of residence. With respect to removing people on account of death, the record will reflect that there were a number of folks who were removed. Yeah. The number with regard to death was, I believe, Professor Smith, upon review of the records, roughly 40,000. Right. In what period? 13 to 15. I thought there was nobody removed even on death that period, but I could be wrong. I believe that the document that you're referring to is referring to inactive voters being removed. Inactive voters who were removed due to ineligible status. Due to change of residence. And having gone the two... I just want to be clear on this. The record reflects that, in fact, they removed people on account of death during the two-year period that ran from January 13 to January 15. Do I have that correct? Your Honor, I am unaware of whether there is a statistics of the number of people removed on death for that particular period of time. Well, I know there's record evidence that, at some point, people were removed on account of death. Yes. And you also put in evidence that suggested that whenever someone died and the state picked it up, they would refer it to the county. And the county's testimony was, we inputted it and removed those people on a daily basis. That's correct, Your Honor. So were people removed during that two-year period on account of death? Although I am unaware of the data points that would reflect that, the testimony at trial from the supervisor's witnesses indicated that these individuals were removed on... So you're what you're... When you say data point, you mean you can't tell me how many? I can't tell you how many. That's what you mean by data point? Yes, Your Honor. Though from the January 2014... Okay, so now let's talk about, then, the other thing. So his argument really is zeroing in on people who were not removed on account of the fact that they had moved. No one was removed for a two-year period. It's inexplicable to me that in a county as large as Broward County that nobody moved in a two-year period. How do we account for the fact that no one is taken off the list on account of this issue of moving? Your Honor, it could be a variety... ...change in residence of the registrant. Was there anything that was put in front of the district court to explain it? No, the district court stated that it was unexplained, the titular certification. Indicating that the individuals were not removed from... Do you know the document number on the certification you're talking about? That two-year certification? The certification, the docket number, is... If you don't have it, I don't want to take too much of your time. It's not right there. Because the language of the certification, does it just say change of address, what is the certification? I thought it was about the whole list. There were no changes. Nobody removed. But I could be wrong. It may have been limited to change of address. Your Honor, I don't have that particular certification in front of me. It's attached to Gessler's report. And if I am incorrect, that it is not... Now, if somebody had moved, but moved within the county, they wouldn't be removed, right? If someone had moved within the county now, they would have their address changed. So there are people who may have moved and weren't counted because they still remain registered voters in Broward. But nevertheless, presumably, some people moved out of Broward County over a two-year period of time. No, I certainly agree, Your Honor, that people certainly moved out of the county. However, what this evidence is, is certainly... Concede, Your Honor, that it is a poor testimony and it reflects badly. However, and if that were the only point of... Only evidence in the record... It's not a question of testimony. It's a fact that they removed no one on account of having a changed residence. To begin testimony, was there any testimony that any efforts were made during that time period to identify people who had moved out of the county? Yes, Your Honor. The three witnesses for the supervisor's office, Mary Hall, Sharon Fleming, and Jorge Nunez, had worked for the office for many years, and they had testified that their work for removing those with change of addresses was ongoing. So why are we looking at that differently than the testimony that work was done to remove deceased voters from the roll during that time as well? No, I don't think that testimony should be looked at differently at all. There's a document reflecting that no one was removed during this time. It's simply contrary evidence. Then there exists also the testimony from the witnesses at trial stating, we removed people. In addition, and if the document... Let me stop you at that point. There's testimony that people were actually removed, even though the certification didn't indicate it? Yes, Your Honor. There's also, for example, they testify that non-forwardable mailings were sent out, even though the certification didn't... Did they tie it to this time period, 13 to 15? Did they say during the year 14, I know we did that? Or do they just talk about generally, we've always made efforts to remove people with change of address? I believe it was the general change. It's just a general statement. We make efforts in our office and there's not a cross as to the time period. Let me just... It's a general statement. Yes, Your Honor. Just a little bit further on that point. I take it there is testimony in the record that, in fact, during this time frame, I'm talking about 13 to 15, that the Board of Elections in Broward County used the methodology that we have already been speaking about, right? Right. What did they say they did during that time frame? They used the postal method and mass mailings at the same time during that time frame? Yes, Your Honor. And the trial court stated that it was found evidence that list maintenance was going on because these millions of mailings were sent out. Here's my question. They're continuing to do what they were required to do and what they did subsequently between 15 and 17. And yet the certification says no one is removed, although they, in fact, say they did remove people. Right. Were they asked in words or substance to explain this disconnect between what they did and what the certification said? I'm not aware that they were asked those specific questions, Your Honor. All right. Let's talk about the other piece of evidence that he references, and that was coming from Camerata. Yes, Your Honor. Did you ever put in any evidence of your own to show the percentages? No, Your Honor. No, Your Honor. That was not our burden. I understand who has the burden. I'm simply asking whether you put anything on to controverted other than to simply undermine the credibility of their expert. Your Honor, Professor Smith testified that the data that their expert used was misleading and simply undermined that data's credibility and weight. However, the supervisor did not put any affirmative data as to the registration rate. Did it undermine it to a certain measurable statistical figure or did it undermine it in total? He undermined it. He stated that the two references that were used in this case were incompatible with one another, that the consequence of that was completely misleading. That's the July date and the October date. Is that what you're talking about? Yes, Your Honor. They took the number of registered voters in July but took the population count as of October. Is that the discrepancy that was used? No, the discrepancy that's being used is that the number of the registration rate is right before a federal general election when registration is at its highest. Is that in October? Yes, I believe that's in October. October versus the county data on population is July? The population measurement is an average. It's an average? Yes. Okay, and so opposing counsel says, okay, he says 95% of everybody's registered to vote. Let's take a, even if you have averaging, I'll take 10 points off of it or he says three or four. But even if it's off by some, it's inconsistent with other counties in Florida and every place else in the country. I don't know what your response is to that. Initially, Your Honor, is the actual registration rate is not in the record. What it actually is, it's all in the record is that the registration they used was inaccurate. But in a way of contrary evidence, Professor Smith- Registration they used was inaccurate. The numbers they used were inaccurate, the statistical measurement that they used as to the registration rate. Expert witnesses? Yes. And Professor Smith testifying on behalf of the intervener, Apple Lee, indicated that upon his review of the maintenance system going on, he reviewed the numbers of people being taken off and added to the registration, or not added to, but just taken off, that he stated that reasonable list maintenance was going on in his opinion. And he's someone whose job is essentially to review- Did the county put any evidence of what the registration rate was vis-a-vis the population of the county? No. Okay. And what time period was Smith's testimony regarding? The, which testimony, I'm sorry, I apologize. The testimony that reasonable, that the subtractions from the list demonstrated that reasonable efforts were going on. He looked at January 2015 to 2017. And he also, I believe, looked at January 2014, December 2016. But we don't have the majority of that two-year period where the certification shows that no one was removed from the roles. He didn't address the majority of that period? No, Your Honor. I thought he referenced one of the two years. No, he- Between 13 and 15, how much did he review? He reviewed January 2015 to the 2017. It's not my question. I apologize. I thought you said that he reviewed something that predated 15. That's correct. And it went from January 14 to January of 16. December 2016. So he looked at one of the two years for which there was no, there was the certification related to. Yes, Your Honor. So in essence, he looked at the period from 14, 15, 16, and 17. He just didn't look at 13. I'm just trying to boil it down and make it easy for myself. Do I have that right? Yes, Your Honor, I believe so. What was his explanation about why he saw reasonable efforts in 14? Was it something we haven't talked about yet? No, when he looked at the numbers, he looked at people being removed, notice addresses being changed. And he testified that this was indicative of reasonable list maintenance occurring. So did he find that it was reasonable that no one had moved out, to believe that no one had moved out of the county in 2014? I don't believe he commented specifically on those certifications, Your Honor. I just want to get this right. Neither lawyer asked Smith whether it was reasonable that no one was removed for that one-year period? Your Honor, the testimony regarding this two-year period was fairly brief in the trial. It was primarily part of Mr. Gessler's testimony that the supervisor's office practiced inconsistent list maintenance. And he stated that it was unreasonable that for a two-year period, no one would be removed. Nevertheless, this argument that it was inconsistent and therefore unreasonable was rebutted by the subsequent testimony showing numerous people were in fact being removed during these years. Because of registration movement. These years being 13 to 15? You understand, we're not concerned about 15 to 17. The numbers are high. The focal point is on the certification in 13 to 15. Right. Were the experts asked to explain how no one was removed for two-year periods? I do not believe that Professor Smith was asked that specific question, no. All right, thank you. Thank you, Your Honor. For the reasons stated by Intervenor Rapoli and the Broward County Supervisor of Relations, I ask this court to affirm the judgment of trial. Thank you much, counsel. And you have reserved four minutes. Yeah, and there's a lot to go over. I'll see if I can do it. Let me just try and clear up some of the things in the record. Judge Hull, you're asking about the removal of deaths versus change of address voters. All of the certifications, the process for removing somebody for change of address is a multi-step process mandated by the NBRA. We first got to identify that they've moved. We've got to send them a notice. If they don't respond to the notice, we put them on inactive. Okay, and on the certifications, there are separate lines for how many people were removed for death. On each of the semi-annual certifications and also the number of inactive voters, those have been because of the change of address that have been put into inactive status. And then after two federal elections, they're supposed to be removed. And the individual certificates, both the original certificates and the doctored or amended ones that were subsequently entered into the record have those zero numbers for inactives removed, all of those for two years, 13 to 15. Does it have anybody removed for death? Yes, it does. Okay, and what- How many? Well, for example, on the January, I'm looking at the 2016 first half of the year, 5,878 removed for death. On 2015 first half of the year, 6,970 removed for death. But on both of those, zero for inactive voters removed. And where's the certifications in the record? Do you have a document? Yeah, I do. It's document number 217-5. And 217-6 were the amended certificates, but those numbers are the same or roughly the same on both. The summary chart that was put together that indicates all of this for the inactives removal is in document number 217-3. It's the last page of the Gessler updated report, and it's also attached to his original record as well. That summary chart indicates that there are zero removed in those four years. Did the district court exclude your expert testimony entirely with regard to the registration rates or just found it not credible or defective? I'm talking about total exclusion versus not reliable and- It was not totally excluded. It was admitted in the evidence. You found it misleading because of the calculations. And Your Honor was exactly right. The difference, the population data was from July because that's the data that's available from the American Community Survey from the Census Bureau. They averaged a month over the year and then they take that midpoint on the year to be the year's population data. Everybody uses that. It wasn't totally excluded. She just gave it a little weight because it was misleading. Yeah, and I want to correct one thing. It wasn't three point differential. It was a 0.3 point differential when you actually look at the data, the difference. But if I adjust the July population data to account for the increases over the next three months, it gives me a 0.3 difference on what the rate would be from 97.6 down to 97.3. This is immaterial. Counsel for the county also said that registrations tend to spike right before federal elections. Is that typical for it to spike to 97%? No, it doesn't. And it's not a misleading number to use the actual registrations before the election. That was the actual registration that simply false to claim that that was an inflated number. It was the actual registrations. Nationwide, we go from like 65% in non-presidential election years up to 71% in presidential election years. We don't get anywhere near 100%, which is what we have in Broward County. And that our expert testified. And I will say Professor Smith was not offered as an expert on election administration. He was simply offered as a political science expert to address the data. Let me read to you what Judge Bloom found after trying the case. I'm reading from pages 19 and 20 of her opinion. After going through what she characterized as the errors in Camerata's analysis. And after saying that she agrees with Smith, the Camerata's chosen denominator underestimates the population in Broward by excluding those registered voters who are not physically present at the time of the survey. While at the same time, his chosen numerator inflates the number of registered voters by including the same population. These data sets not allow for an accurate comparison. Similarly, Camerata's use of the five-year period 2014 data, which accounts for population in July of 12, does not reflect the population numbers in existence in October 12. The net effect she writes here is that Camerata's compared voter registration numbers when they are high at their all time high to population estimates from July of 12. She rejects the comparison and says, given the foregoing quote, the court finds that the registration rates presented by ACRU are inaccurate. ACRU's argument that Broward County's registration rates are unreasonably high is therefore unsupported by any credible evidence and necessarily fails to support ACR's contention that Snipes failed to comply with the NVRA list maintenance requirement. Now, she may have been wrong. She may have been clearly wrong. You may be right that this clear error in the determination, but I don't know how to read this other than to say she rejected Camerata's analysis, Camerata's numbers, and the critical inference that you would have her draw from Camerata's testimony. Am I misreading this? I'll disagree that it was such a critical inference because it's not. Am I misreading what she found? No, you're not misreading what she found. But I will say that, Judge, Mr. Camerata's evidence included a chart that has both the one-year population data as well as the five-year. He did not rely on the five-year. The five-year bolsters the registration rate even more because, and she was right about this. Judge Bloom was right about this. The five-year data looks back to an average point in the five years. That's two and a half years old data. So that would be inflated. No, no, but the conclusion she draws from all of this is your argument that the registration rates were unreasonably high as unsupported by the credible evidence. And that I disagree with because- But that's a finding of fact. You have to show me that it's clearly erroneous. We'll give you another minute to finish up. Okay, so- Only one minute, counsel. We've already gone way, way over. All right, all right. Well, let me, because I want it, because there's another point here that I want to make, and that is whether they were complied even on the mass mailings. The record, it makes very clear that, for example, the mass mailings, the certificates say there were no mass mailings. They then amended the certificates to say there were, but they had no idea of what the mass mailings do. The state law required that they be non-forwardable. They testified, oh yeah, they must have been non-forwardable, but the evidence in the record that actually has the mailing pieces specifically says that they are forwardable mails. This kind of inability to even know what they were doing was manifest throughout the record. I think the cumulative effect of all of that as testified to unrebutted by Mr. Gessler, and then when you add the fact that not a single person was removed for two years, this is manifestly evidence that there is not a systematic system of voterless maintenance going on, even with respect to change of address, and that doesn't even begin to get to Section C-2's obligation. It's not just our statement on this. It's the federal government statement in the Missouri case. Their specific count for complaint in that is they did not have any program to systematically remove ineligible voters, not just ineligible by reason of death or relocation, but ineligible voters. Thanks very much, counsel. Thank you all. We're going to take a 10-minute break. When we come back, we'll finish up with the last.